UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TANGOE, INC., | : | CIVIL ACTION NO. |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| LOUIS A. IFANTIS, | : | |
| | : | |
| Defendant. | : | JUNE 14, 2013 |

## VERIFIED COMPLAINT

The plaintiff, Tangoe, Inc. ("Tangoe"), by its attorneys, alleges for its Complaint against the defendant, Louis A. Ifantis, on knowledge as to its own conduct and otherwise on information and belief, as follows.

## NATURE OF THE ACTION

1.     Tangoe brings this action against Louis A. Ifantis ("Ifantis"), a former employee, for damages and injunctive relief arising out of Ifantis's breach of his contractual obligations to Tangoe and violation of Connecticut law.

2.     In direct violation of his contractual obligations, Ifantis commenced employment with a direct competitor of the plaintiff, and, despite his assurances to Tangoe to the contrary, began competing against Tangoe and soliciting Tangoe's prospective clients, using Tangoe's confidential information.  In further breach, Ifantis also intentionally and maliciously solicited another Tangoe employee to leave her employment with Tangoe and commence employment with Market Data Services Limited ("MDSL") in violation of his contractual obligations to Tangoe.

2651755v4

## THE PARTIES

3.      Plaintiff Tangoe is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Orange, Connecticut.

4.      Ifantis is an individual residing in the State of New Jersey and is a former employee of Tangoe.

## JURISDICTION AND VENUE

5.      Jurisdiction exists in this Court pursuant to 28 U.S.C. § 1332 based on complete diversity of citizenship between the parties and because the value of the rights of the plaintiff implicated by the conduct alleged herein and the actual and potential loss to the plaintiff as a result of the defendant's unlawful conduct exceeds $75,000.

6.      This Court has personal jurisdiction over Ifantis pursuant to Conn. Gen. Stat. § 52-59b(a) because he committed a tortious act outside of the State of Connecticut causing injury to plaintiff within the State of Connecticut.  The Court also has personal jurisdiction over the defendant pursuant to Conn. Gen. Stat. § 52-59b(a) because he knowingly accepted a position of employment with a Connecticut company; traveled to Connecticut for business related purposes; had continuous and ongoing contact with plaintiff in Connecticut regarding the performance of employment related duties; received a regular paycheck mailed from Connecticut and drawn on a Connecticut bank; and, during the course of employment with Tangoe, the defendant regularly accessed and used plaintiff's computer network and e-mail system, located in Orange, Connecticut.

2

## TANGOE'S GLOBAL TEM BUSINESS

7.     Tangoe was founded in 2000 and has become a global leader in communications lifecycle management solutions.  It provides software, consulting, and technology-enabled managed services that help global organizations procure, manage, and control their fixed and mobile communications assets and their associated costs.  Tangoe's Mobile Device Management ("MDM") solution is the most comprehensive smartphone and tablet lifecycle management solution available.  Tangoe's Telecom Expense Management ("TEM") services are a key offering within its communications lifecycle management service suite.

8.     Through its TEM services, Tangoe supports its clients' businesses around the world by providing fully managed solutions that permit its clients to understand, control and manage their fixed and mobile communications systems in order to maximize value from their telecommunications services and reduce costs.

9.     The TEM market is intensely competitive, and Tangoe frequently competes with other service providers for the same customer base across the United States and the world.

10.    Tangoe relies on the goodwill that it has established with its customers in order to stay competitive in the TEM market.

11.    Tangoe has expended significant time and money to grow its business and the goodwill associated with it.  Tangoe's goodwill is and has been established and maintained through direct contact with customers and prospective customers via the company's employees.

12.    Tangoe has, through its years of developing goodwill with its customers and its extensive familiarity with its customers' business operations and needs, established itself in the TEM market and formed long-lasting and stable business relationships with various customers.

3

13.     In addition, Tangoe's ability to provide its services globally is of the utmost importance to its competitive position in the TEM market.  Global operations require detailed knowledge of local and regional regulatory schemes and an infrastructure capable of supporting the transmission of billing data in a timely fashion.

14.     The telecommunications industry is subject to complex regulatory schemes governing wireless, voice and data transmission providers.  On a global level, these regulatory schemes are rendered much more complex by the countless jurisdictions that regulate the telecommunications industry.

15.     In order to compete in the TEM market on a global basis, Tangoe has developed and maintains comprehensive regulatory and telecommunications provider databases that record and track the multifaceted requirements faced by providers in any given jurisdiction.

16.     These databases are Tangoe's confidential information and were assembled over years of research and investigation and could not be readily duplicated by others without extraordinary effort and expense.

17.     Telecommunications providers also face various laws and other regulatory requirements governing the transmission of financial and privacy information within various jurisdictions.

18.     In response to these requirements, Tangoe has developed and implemented a global infrastructure that allows for a timely and orderly processing of provider invoices within these complicated regulator schemes.

19.     This infrastructure is Tangoe's confidential information and, to the best of Tangoe's knowledge, employs a methodology that is unique to Tangoe.

4

20.     Tangoe's confidential information is crucial to Tangoe as it enables Tangoe to compete in the marketplace effectively.  The confidential information is therefore extremely valuable to Tangoe in providing it with a competitive advantage.  If they were able to procure Tangoe's confidential information, Tangoe's competitors would find the information to be extremely valuable.

21.     Tangoe has taken reasonable steps and has devoted substantial efforts to maintain and safeguard the confidentiality of its proprietary information.  Tangoe guards its confidential information by employing various security measures with respect to its physical facilities and its computerized data.  Tangoe also maintains internal policies and procedures concerning its confidential information and employs contractual agreements in order to protect its confidential information.

22.     Among other things, Tangoe:  limits access to its physical facilities to authorized guests who are required to sign in and who are escorted by a Tangoe employee while on the premises; enters into non-disclosure agreements with third parties with whom its confidential information may be shared; requires that each employee execute a confidentiality agreement; put in place employee policies that affirm employee obligations of confidentiality and that provide for disciplinary sanctions; controls access to Tangoe's computer network via password protection and via a protected virtual private network, limiting access to Tangoe's customer service and related technology and service platforms to those employees with a need to use those platforms in performing their job functions; and limits access to shared drives and other network information to permitted users, via password, who are granted rights based on the requirements of their jobs.

2651755v4

## DEFENDANT'S EMPLOYMENT BY TANGOE

23.     In 2009, Tangoe hired Ifantis to be a "Program Lead" in Tangoe's TEM business.

24.     In or about November, 2009, in connection with his employment by Tangoe, Ifantis executed an Employee Confidentiality Agreement (the "Agreement").  A copy of the agreement is attached hereto as Exhibit A.

25.     In executing the Agreement, Ifantis acknowledged that he would be provided access to Tangoe's proprietary information in the course of the employment relationship.

26.     With regard to such confidential information, Ifantis agreed:

I shall not ... either during my employment of at any time after my termination, disclose to any person, and shall use my best efforts to prevent the publication or disclosure of, any trade secret or other confidential information, including but not limited to any information, knowledge, know-how, data, records, inventions, whether written or otherwise and whether or not conceived, originated, discovered, or developed in whole or in part by me, not generally available to the public concerning the business, finances, policies, procedures, operations (including my compensation package and those of other employees, or information found in Tangoe's Employee Handbook) assets, liabilities, existing or prospective customer lists, transactions or affairs of the Company or of any of their respective customers or clients, or concerning any officer, director, employee, or agent by the Company, entrusted to me or arising or coming to my knowledge during the course of my employment with Company or otherwise.  I will not, except for Company use, copy, duplicate, transcribe, or in any way reproduce any Company documents or objects or remove them from the Company's office or facilities nor use any information concerning them except for the Company's sole benefit, either during my employment or thereafter.

27.     Ifantis further acknowledged and agreed:

All files, records, documents, lists of customers, correspondence, drawings, specifications, equipment, and similar items relating t o the business of the Company, whether prepared by me or otherwise coming into my possession, shall remain the exclusive property of the Company and shall not be removed from the premises of the Company under any circumstances whatsoever without

6

2651755v4

the prior written consent of the Company.  I agree that upon my termination I shall immediately deliver to the Company all such property and shall not retain any copies.

28.     The Agreement also includes a covenant not to compete with Tangoe:

I agree that during the period that I am employed by the Company and for a period of one (1) year thereafter I will not, without the express written consent of Company, either alone or in concert with others, directly or indirectly, own, be a partner in, operate, be employed by, act as an advisor, consultant, agent, officer, director, or independent contractor for any company in direct competition with Tangoe.

29.     Ifantis additionally agreed to covenants not to solicit customers or employees of

Tangoe following the cessation his employment:

I agree that during the period I am employed by the Company and for a period of two (2) years thereafter, I will not, without the express written consent of Company,  either alone or in concert with others, directly or indirectly, solicit, entice, induce or encourage: (1) any employee(s) to leave the employment of the Company; (b) any existing or prospective client(s) to discontinue using the Company's services or discourage such use; (c) any existing client(s) to refer prospective clients to any other competitor of Company or to discontinue referring prospective clients to the Company or to switch clients from the Company to any other competitor of Company; or (d) any existing or proposed arrangement or other community or institutionally affiliation to discontinue the affiliation or relationship with Company or any of its Affiliated Companies.

30.     Pursuant to the Agreement, Ifantis further acknowledged that "[i]n the event of

a breach or threatened breach of any of the provision(s) of [the] Agreement, [Tangoe] shall be

entitled to, in addition to other remedies and damages available, an injunction to restrain any

such breach or threatened breach."

31.     At the time of his hiring, Ifantis had little experience in the TEM field, and no

experience with the intricacies of providing TEM services on a global basis.

7

32.     Ifantis initially reported directly to Tangoe's senior vice-president in charge of TEM operations and later to Tangoe's Director of Operations.

33.     In that role, Ifantis received extensive training in, and access to, Tangoe's global TEM operations platform, including access to Tangoe's data mapping systems, Tangoe's infrastructure for payment processing, the complex regulatory schemes governing the provision of telecommunications services throughout the world, and detailed information regarding the operations and practices of the hundreds of telecommunication providers implicated by a global operation. Ifantis specifically was given access to Tangoe's telecommunication provider database and the full scope of Tangoe's global invoicing infrastructure.

34.     As part of his job responsibilities as Program Lead, Ifantis was tasked with updating and keeping current with Tangoe's databases that tracked telecommunications providers and regulatory schemes globally.

35.     In addition, Ifantis communicated with prospective and existing Tangoe TEM customers and supported the sales processes of Tangoe's TEM sales department for existing and new customers, as well as delivery of the Tangoe TEM services. Ifantis was also responsible for initiating and maintaining customer relationships, anticipating and identifying customer issues and concerns, and proposing advice as appropriate. Ifantis had direct contact with a number of Tangoe's largest TEM clients and was given access to a wide range of Tangoe's confidential and proprietary information. As such, Ifantis was responsible for establishing and maintaining goodwill with Tangoe's customers on behalf of Tangoe.

## IFANTIS LEAVES TANGOE TO JOIN MDSL

36.    Ifantis resigned from his employment with Tangoe and ceased employment on or about August 17, 2012.

37.    In disregard of his non-competition obligations, Ifantis commenced employment with MDSL, a direct competitor of Tangoe in the TEM market.

38.    By letter dated September 11, 2012, Tangoe contacted Ifantis and reminded him of his contractual obligations and demanded that he immediately cease and desist from taking any additional actions in breach of the Agreement.

39.    Ifantis responded, through counsel, and assured Tangoe, among other things, that he would not be engaged in competitive activities in the course of his employment with MDSL, that he had informed MDSL of his contract with Tangoe, that MDSL had "walled him off" from having any contact with a certain Tangoe client for which he had provided services, that he was exclusively in a customer service role as a "techie" and as such was not in any position where he would compete with Tangoe, and that he did not possess any Tangoe documents or proprietary information.

40.    MDSL thereafter began touting on its website the fact that Ifantis had joined its ranks, claiming that "Lou Ifantis strengthens US TEM team as Service Delivery Manager" and "Lou's appointment marks a significant expansion of MDSL's US TEM operations as Service Delivery Manager."

41.    MDSL further stated:

Lou previously served as Program Lead at Tangoe and brings nearly 10 years of detailed international TEM experience, having built and managed the TEM business process outsourcing programs of a number of global Fortune-250 companies. MDSL-

2651755v1

watchers will know this is a fast-growing section of the organization, and one where Lou's top-level experience will provide a valuable additional resource.

## IFANTIS SOLICITS ROSA WILLIAMS TO LEAVE TANGOE AND JOIN MDSL

42.    Upon information and belief, after leaving Tangoe and joining MDSL, Ifantis knowingly and willfully solicited a Tangoe employee, Rosa Williams, to terminate her employment with Tangoe and accept a position with MDSL in violation of her contractual non-competition obligations.

43.    Williams started working at Tangoe in December 2009, shortly after Ifantis began his employment at Tangoe.  Williams worked closely with Ifantis at Tangoe and was bound by essentially the same contractual commitments regarding non-competition and non-solicitation as was Ifantis.

44.    Williams' employment with Tangoe terminated on or about December 28, 2012.

45.    During the course of Williams' exit interview with Tangoe, Williams emphatically denied that she was leaving to join Ifantis or that she would be working for MDSL.

46.    Tangoe since learned that Williams accepted employment with MDSL in breach of her non-competition obligations to Tangoe.

## TANGOE AGAIN SEEKS ASSURANCES FROM IFANTIS

47.    Tangoe again contacted Ifantis in a good-faith attempt to address its concerns and to secure the benefit of the contractual commitments made by Ifantis.  Tangoe also notified Ifantis's new employer, MDSL, of its concerns.

48.    Tangoe was again assured, by Ifantis's new employer MDSL, that Ifantis did not work in any capacity that competes with Tangoe or in which he would be provided with the

10

opportunity to solicit any Tangoe customer or prospect. MDSL further represented that Ifantis's interaction with MDSL customers, if at all, was solely as a technical adviser.

49.     Tangoe attempted to follow up with Ifantis directly at the end of January, but Ifantis did not respond.

50.     Contrary to his assurances to Tangoe, upon information and belief, Ifantis was a member of MDSL's sales team that directly competed against Tangoe to solicit at least one of Tangoe's largest prospects on behalf of MDSL.

51.     Tangoe has since discovered that Ifantis used Tangoe confidential information obtained during his employment with Tangoe to solicit at least one additional prospective client, to discourage that prospective client from using Tangoe's services, and to compete unfairly against Tangoe.

52.     Specifically, Tangoe was informed that Ifantis shared with a then-prospective MDSL customer at least one of Tangoe's proprietary databases.

53.     In addition, Tangoe has recently discovered that MDSL is attempting to establish a global invoicing infrastructure that is identical to Tangoe's unique method.

## COUNT ONE:     BREACH OF CONTRACT

54.     Paragraphs 1 through 53, above, are repeated and re-alleged as if fully set forth herein

55.     Ifantis has willfully violated the Agreement by accepting employment with MDSL, a direct competitor of Tangoe, within the one (1) year period following his employment with Tangoe; and his breach has damaged and/or interfered with, or will damage

and/or interfere with, the established goodwill and business relationships Tangoe shares with its existing customers and is building with prospective customers.

56.     Ifantis has further violated the Agreement by using Tangoe's confidential information.

57.     Ifantis has further violated the Agreement by soliciting Williams to terminate her employment with Tangoe and to accept employment with MDSL.

58.     Tangoe has performed all of its obligations under the Agreement.

59.     As a result of Ifantis's conduct, Tangoe has been and will continue to be irreparably harmed and damaged unless such actions by defendant are immediately enjoined.

**COUNT TWO:     VIOLATION OF CONNECTICUT UNIFORM TRADE SECRETS ACT, CONN. GEN. STAT. §§ 35-50 et seq.**

60.     Paragraphs 1 through 59, above, are repeated and re-alleged as if fully set forth herein.

61.     As set forth above, Ifantis has intimate knowledge or Tangoe's confidential and proprietary trade secret information regarding at least its global TEM business.

62.     Contrary to his representations to Tangoe, Ifantis was still in possession of Tangoe's confidential and proprietary trade secret information after he left Tangoe's employ.

63.     Upon information and belief, Ifantis has used Tangoe's confidential and proprietary information in the solicitation of at least one client on behalf of MDSL.

64.     Such use of Tangoe's confidential and proprietary information was willful and malicious.

2651755v4

65.     The disclosure of Tangoe's confidential and proprietary trade secret information irreparably harms Tangoe and causes damages that cannot be readily ascertained in an exact monetary amount.

66.     The Connecticut Uniform Trade Secrets Act ("CUTSA"), as codified in Conn. Gen. Stat. §§ 35-50 et seq., permits injunctive relief for the actual or threatened misappropriation of confidential and proprietary trade secret information.

67.     CUTSA also permits the recovery of money damages, punitive damages and attorneys' fees for the actual misappropriation of trade secrets.

68.     Tangoe is thus entitled to injunctive relief prohibiting Ifantis's misappropriation and will seek monetary relief, punitive damages, and attorneys' fees for the misappropriation that has occurred.

## COUNT THREE:     TORTIOUS INTERFERENCE

69.     Paragraphs 1 through 68, above, are repeated and re-alleged as if fully set forth herein.

70.     Tangoe had a contract with Williams arising out of her employment by Tangoe.

71.     Ifantis knew of this contractual relationship and, in particular, Ifantis was aware of Williams' non-compete obligations.

72.     Ifantis engaged in intentional and wrongful acts designed to induce a breach or disruption of that contractual relationship.  Specifically, in breach of his non-solicitation obligation, Ifantis solicited, encouraged and/or induced Williams to breach her contract with Tangoe by accepting employment with a direct competitor.

2651755v4

73.     Ifantis' intentional, willful and wrongful conduct has caused a breach and/or disruption of the contractual relationship between Tangoe and Williams.

74.     Ifantis' actions have caused and will continue to cause harm and other damage to Tangoe to an extent currently undetermined.

**COUNT FOUR:        VIOLATION OF CUTPA, CONN. GEN. STAT. §§ 42-110a et seq.**

75.     Paragraphs 1 through 74, above, are repeated and re-alleged as if fully set forth herein.

76.     Tangoe is a "person" within the meaning of Conn. Gen. Stat. §§ 42-110a(3) and 42-110g(a) entitled to bring an action under the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, et seq. ("CUTPA").

77.     At all relevant times, Ifantis was a person acting in the conduct of trade or commerce within the meaning of Conn. Gen. Stat. §§ 42-110a et seq.

78.     The foregoing actions of Ifantis constitutes unfair and deceptive acts and practices in the conduct of trade or commerce that are unethical, unscrupulous and offensive to public policy, and are a violation of Conn. Gen. Stat. § 42-110b(a).

79.     As a result of the foregoing unfair and deceptive acts and practices, Tangoe has suffered an ascertainable loss within the meaning of Conn. Gen. Stat. §§ 42-110g(a) and has suffered damages in an amount to be determined at trial.

80.     The foregoing actions of Ifantis show calculated, deceitful and unfair conduct, and reckless indifference to the rights of the plaintiff.  Accordingly, Ifantis is liable to Tangoe for punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a).

2651755v4

81.     Tangoe is sending a copy of this Complaint to the Attorney General of the State of Connecticut and to the Commissioner of Consumer Protection for the State of Connecticut, as required by Conn. Gen. Stat. § 42-110g(c).

WHEREFORE, Tangoe seeks:

1.      A preliminary injunction and a permanent injunction enjoining and restraining defendant and anyone working in concert with him from breaching the terms of the non-competition covenant contained in the Agreement;

2.      A preliminary injunction and permanent injunction enjoining and restraining defendant from breaching the terms of the non-solicitation covenant contained in the Agreement;

3.      A preliminary injunction and a permanent injunction enjoining and restraining Ifantis, his agents, servants, representatives and all persons or entities acting or claiming to act on behalf of or in concert with or participating with him:

      a.      From using directly or indirectly any of plaintiff's confidential information; and

      b.      From disclosing in any manner to anyone any of plaintiff's confidential information; and

      c.      Directing Ifantis to return to Tangoe all Tangoe confidential information in his possession, custody or control;

4.      Compensatory damages;

2651755v1

5.    Punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a) and Conn. Gen. Stat. § 35-53;

6.    Attorney's fees and costs pursuant to the terms of the Agreement and Conn. Gen. Stat. § 42-110g(d) and Conn. Gen. Stat. § 35-53;

7.    Costs;

8.    Interest; and

9.    Any other such relief at law or in equity that the court deems just and appropriate.

PLAINTIFF,
TANGOE, INC.,


By    /s/Glenn M. Cunningham
     Glenn M. Cunningham
     Federal Bar No. ct09995
     Susan S. Murphy
     Federal Bar No. ct25321
     For Shipman & Goodwin LLP
     One Constitution Plaza
     Hartford, Connecticut 06103
     Tel.: (860) 251-5000
     Fax: (860) 251-5218
     Its Attorneys

## VERIFICATION

Don Farias duly certifies that he is the SVP of TEM Operations for Tangoe, Inc., he has read the contents of the attached Verified Complaint, he is familiar with the contents therein, and he certifies that the contents of the Verified Complaint are true to the best of his knowledge, information and belief.

_____

Don Farias

STATE OF NEW JERSEY      )
                                 ) ss.:
COUNTY OF                   )

Subscribed and sworn to before me this _11_ day of June 2013.

**CLAY MANLEY**
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
**8/8/2015**

_____
Notary Public/Commissioner of the Superior Court
My Commission Expires:

2651755v4

Exhibit A



## EMPLOYEE CONFIDENTIALITY AGREEMENT

THIS CONFIDENTIALITY AGREEMENT (hereinafter, the "Agreement") is entered into by the undersigned individual as of this ___11 / 11 / 09____ .
(month/day/year)

I, _Louis Ifantis_ (employee name) acknowledge that in connection with my employment with Tangoe, Inc (the "Company"), I may develop and/or have access to various confidential information of the Company's not otherwise available to the public, and trade secrets, including inventions, discoveries, concepts and ideas, whether patentable or copyrightable, including, but not limited to, hardware and apparatus, processes and methods, formulas, computer programs, software and techniques, as well as improvements thereof and knowledge related thereto;

I understand that in consideration of my continuing employment and as a condition of employment with the Company, the salary and wages paid for my services in the course of such employment, and for other good and valuable consideration, which I hereby acknowledge, I hereby agree as follows:

### Confidential Information
1. I shall not (except in the proper performance of my duties on behalf of the Company) either during my employment or at any time after my termination, disclose to any person, and shall use my best efforts to prevent the publication or disclosure of, any trade secret or other confidential information, including but not limited to any information, knowledge, know-how, data, records, inventions, whether written or otherwise and whether or not conceived, originated, discovered, or developed in whole or in part by me, not generally available to the public concerning the business, finances, policies, procedures, operations (including my compensation package and those of other employees, or information found in Tangoe's Employee Handbook) assets, liabilities, existing and/or prospective customer lists, transactions or affairs of the Company or of any of their respective or customers or clients, or concerning any officer, director, employee, or agent of the Company, entrusted to me or arising or coming to my knowledge during the course of my employment with Company or otherwise. I will not, except for Company use, copy, duplicate, transcribe, or in any way reproduce any Company documents or objects or remove them from the Company's office or facilities nor use any information concerning them except for the Company's sole benefit, either during my employment or thereafter. This provision shall not apply to any information, which is now in, or subsequently comes into, the public domain provided that I have not disclosed or caused to be disclosed such information so as to make it public.

2.  All files, records, documents, lists of customers, correspondence, drawings, specifications, equipment, and similar items relating to the business of the Company, whether prepared by me or otherwise coming into my possession, shall remain the exclusive property of the Company and shall not be removed from the premises of the Company under any circumstances whatsoever without the prior written consent of the Company. I agree that upon my termination I shall immediately deliver to the Company all such property and shall not retain any copies.

## Developments

1.  I agree to make a prompt and complete disclosure of every invention (as hereafter defined) which I may conceive or reduce to practice, and any patent application which I may file, during the term of my employment with the Company, and further agree that every said invention and patent application shall be the property of Company.   I understand that the term invention means any discoveries, developments, concepts, and ideas whether patentable, copyrightable or not, which relate to any present or prospective activities of the Company with which activities I am acquainted as a result or consequence of my employment with the Company. Such inventions shall include, but not be limited to, processes, methods, products, software, apparatus, trademarks, trade names, service marks, advertising, and promotional material, as well as improvements and know-how related thereto. I further agree that upon Company's request, but without expense to me, I will execute any applications, assignments, and other instruments which Company shall deem necessary or convenient for the protection of its property in United States and/or foreign countries, and I will render assistance in any litigation or other proceeding pertaining to the property and understand that the Company will reimburse me for all reasonable costs associated with such assistance.

2.  Company agrees that any invention made by me in which the Company states in writing over the signature of Company's President that it has no desire to exploit may be freely exploited by me.

3.  I agree that all writings, illustrations, models, and other such materials produced by me or put into my possession by Company during the term of my employment are at all times the Company's property and shall be considered works made for hire under U.S. Copyright Laws. To the extent that such works are not works made for hire as defined by U.S. Copyright Law, I hereby assign, transfer, and grant to Company any and all rights (including but not limited to copyrights) in and to all works provided hereunder. Any and all copyrights ownership claims which Employee may raise as a result of work undertaken pursuant this agreement are hereby assigned, transferred, and granted to Company. I will deliver all such property over to the Company upon its request or upon the termination of my employment.

4. This Agreement does not apply to an invention for which no equipment, supplies, facility, funds, or trade secret information of Company was used and which was developed entirely on my own time, and (1) which does not relate, (a) directly to the business of the Company, or (b) to the Company's actual or demonstrably anticipated research or development, or (2) which does not result from any work performed by me for the Company.

5. I acknowledge that my obligations under this Agreement shall continue beyond the termination of my employment with respect to inventions conceived or made by me during my employment with the Company.

**Non-solicitation/Non-competition**

1. <u>Noncompetition</u>. I agree that during the period that I am employed by the Company and for a period of one (1) year thereafter I will not, without the express written consent of Company, either alone or in concert with others, directly or indirectly, own, be a partner in, operate, be employed by, act as an advisor, consultant, agent, officer, director, or independent contractor for any company in direct competition with Tangoe. I agree and acknowledge that the consideration I have directly or indirectly received for this covenant includes but is not necessarily limited to the rights and privileges offered to me by virtue of my employment with the Company.

2. <u>Nonsolicitation</u>. I agree that during the period I am employed by the Company and for a period of two (2) years thereafter, I will not, without the express written consent of Company, either alone or in concert with others, directly or indirectly, solicit, entice, induce or encourage: (a) any employee(s) to leave the employment of the Company (b) any existing or prospective client(s) to discontinue using the Company's services or discourage such use;  (c) any existing clients(s) to refer prospective clients to any other competitor of Company or to discontinue referring prospective clients to the Company or to switch clients from the Company to any other competitor of Company; or (d) any existing or proposed arrangement or other community or institutional affiliation to discontinue the affiliation or relationship with Company or any of its Affiliated Companies. For the purpose of this Agreement, "existing client(s)" shall mean any third party under a contractual relationship with the Company at any time during my employment for which I had direct or indirect knowledge and was either directly or indirectly involved with the provision of services or had knowledge thereof. For the purpose of this Agreement, "prospective client(s)" shall mean any third party not under a contractual relationship with the Company during my employment, but for which I had direct or indirect knowledge relating to the solicitations, negotiations, offers, or other communications between the Company and the prospective client related in any way to the prospective provision of services by the Company.  I agree and acknowledge that the consideration I have directly or indirectly received for this covenant includes but is not necessarily limited to the rights and privileges offered to me by virtue of my employment with the Company.

**Miscellaneous**

1. I recognize that irreparable injury will result to the Company in the event of a breach or threat of breach of any of the provision(s) of this Agreement Therefore, I agree that in the event of a breach or threat of breach of any of the provision(s) of Agreement, the Company shall be entitled to, in addition to other remedies and damages available, an injunction to restrain any such breach or threat of breach by me and all persons acting for and/or in concert with me. If any dispute(s) arises between the Company and me with respect to any matter which is the subject of this Agreement, the Company, upon prevailing in such dispute, shall be entitled to recover from me all Company's costs and expenses including its reasonable attorneys' fees. My obligations set forth in this Agreement shall survive any termination, for whatsoever reason, of this Agreement and my employment.

2. Each provision of this Agreement shall be considered separable and if for any reason any provision     is determined to be invalid or contrary to any existing or future law, such invalidity shall not impair the operation of or affect those provisions that are valid. This Agreement constitutes the entire agreement between the Company and me and supersedes all prior or contemporaneous spoken agreement(s), statement(s), representation(s), or understandings between the Company and me. Furthermore, notwithstanding any other provision of this Agreement, my employment relationship with the Company is at will, and this Agreement does not in any way grant, imply, or create a contract of employment for any specific period of time.

3. This Agreement shall be construed, applied and governed in all respects by the laws of the state of Connecticut. In so far as it shall apply, the Connecticut Uniform Trade Secrets Act, including the definitions contained therein, shall govern the interpretation and enforcement of the appropriate provisions of this Agreement. However, the Connecticut Uniform Trade Secrets Act shall not supersede, and the parties agree that the Company shall have, such other rights and remedies as may otherwise be available to it, including, but not limited to, any tort, restitution or other law pertaining to civil liability for misappropriation of a trade secret.

4. I acknowledge that my obligations under this Agreement shall be binding on my heirs, executors, administrators or other legal representatives or assigns, and this Agreement shall inure to the benefit of the Company, its successors, and assigns.

5. I acknowledge and warrant that I have no agreements with, or obligations to, others in conflict with the obligations to Company established in this Agreement.

6. This Agreement may not, on behalf of or with respect to the Company, be changed or modified, or released or discharged, or abandoned or otherwise terminated, in whole or in part, except by an instrument in writing signed by an authorized officer of the Company.

7. Upon the termination of my employment with Company, for whatever reason, I agree that, if so requested by Company, I will reaffirm in writing my recognition of my ongoing obligations to maintain the confidentiality of the Company's confidential information and all other obligations as set forth in this Agreement.

**IN WITNESS WHEREOF, the undersigned has executed this Agreement on the date written above.**

"EMPLOYEE"

_____
Signature

_____
Printed Name